**Exhibit 11**

U.S. ex rel. Wilkins v. North American Const. Corp.
S.D.Tex.,2001.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Houston Division.
UNITED STATES OF AMERICA, ex rel. Patrick Wilkins, Plaintiffs,
v.
NORTH AMERICAN CONSTRUCTION CORPORATION, CH & A Corporation, et al., Defendants.
**No. Civ.A. H-95-5614.**

Sept. 26, 2001.

MEMORANDUM AND OPINION
ROSENTHAL, J.
***1** Defendants CH & A Corporation ("CH & A") and Weatherford International, Inc. ("Weatherford" ) have moved for partial summary judgment on the government's common law fraud claim. (Docket Entry No. 164, 165). Defendant North American Construction Corporation ("NACC") has moved to adopt the partial summary judgment motions. (Docket Entry No. 172). The United States has responded; CH & A has replied. (Docket Entry Nos. 170, 171, 175).

Defendants argue that the three-year statute of limitations governing the common law fraud claim had expired before the government filed its complaint-in-intervention on October 22, 1998. Defendants contend that the fraud cause of action accrued, and the statute began to run, by May 1994, when defendants submitted the Request for Equitable Adjustment ("REA") that is the basis of the fraud claim, or, at the latest, by June 1995, when the government completed its audit of the REA. Defendants assert that by those dates, the government knew, or reasonably could have known, the facts material to its common law fraud cause of action, so as to trigger limitations. In response, the government contends that it was unaware of crucial facts material to the common law fraud claim until the relator, Patrick Wilkins, filed suit in December 1995. Alternatively, the government argues that its complaint-in-intervention, filed in October 1998, relates back to the date when the relator filed his original complaint.

Based on a review of the motions, the response, the reply, the parties' submissions, and the applicable law, this court GRANTS defendant NACC's motion to adopt the other defendants' motion for partial summary judgment and GRANTS the motion for summary judgment on the common law fraud claim as to all three defendants. The reasons are set out below.

I. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. Under Fed. R. Civ. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v.. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). When the moving party has met its Rule 56(c) burden, the nonmovant must designate specific facts showing that there is a genuine issue for trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 325).

"[W]hen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law." ' *Lemoine v. New Horizons Ranch & Ctr., Inc.,* 174 F.3d 629, 633 (5th Cir.1999) (quoting *Colston v. Barnhart,* 146 F.3d 282, 284 (5th Cir.1998)).

***2** In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "Rule 56 *'mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." ' *Little,* 37 F.3d at 1075 (quoting *Celotex,* 477 U.S. at 322).

II. The Applicable Legal Standard

28 U.S.C. § 2415(b) states:

Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues ...

Section 2416 states:

For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which ... (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances.

28 U.S.C. §§ 2415, 2416.

The parties agree that this federal statute determines the limitations period, although state substantive law governs the common law fraud claim. *See United States v. Moore,* 968 F.2d 1099, 1100-01 (11th Cir.1992). The issue is when the relevant responsible official knew, or could reasonably have known, of the facts material to the government's fraud claim, so as to trigger limitations. *See Phillips Petro. Co. v. Lujan,* 4 F.3d 858, 863 (10th Cir.1993) .

The Supreme Court has held that " '[s]tatutes of limitations sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government." ' *Badaracco v. Commissioner,* 464 U.S. 386, 391 (1984) (quoting *E.I. Dupont de Nemours & Co. v. Davis,* 264 U.S. 456, 462 (1924)). Under federal law, a cause of action does not "accrue" until a plaintiff knows or has reason to know of his injury. *See Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1991); *United States v. Incorporated Village of Island Park,* 791 F.Supp. 354, 360 (E.D.N.Y.1992); *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, (1981) (" [F]ederal law ... 'establishes as the time of accrual that point ... when the plaintiff knows or has reason to know of the injury which is the basis of his action. " ') (quoting *Bireline v. Seagondollar,* 567 F.2d 260, 263 (4th Cir.1977), *cert. denied,* 444 U.S. 842, (1979))

Section 2416 defines the discovery rule that applies to limitations under section 2415. Courts must exclude time during which responsible government officials do not know, and reasonably could not know, the "facts material to the right of action." Section 2416 recalls the common law doctrine of equitable tolling, under which a plaintiff aware of an injury may delay or toll limitations if, despite due diligence, he is unable to obtain material information bearing on the existence of his claim. *See Cada,* 920 F.2d at 451; *see also Incorporated Village of Island Park,* 791 F.Supp. at 361 (comparing section 2416 to the related doctrine of fraudulent concealment).

***3** The application of section 2416 requires identification of a responsible government official;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

analysis of the "facts material to the right of action" ; and the determination of when that officer could reasonably know those material facts. These questions are analyzed against the summary judgment evidence.

A. "Responsible Official"

The government contends that an "official of the United States charged with the responsibility to act in the circumstances," whose knowledge can trigger the statutory period, refers exclusively to an official of the Department of Justice. Defendants respond that the term can apply to an official of any government agency, as long as that official has the requisite responsibility for the activity from which the cause of action arises. Under this definition, defendants assert that Dan L. Johnson, the Administrative Contracting Officer for Contract No. DACA56-91-C-0110, including contract modification 9, is a "responsible official" under section 2416(c). Defendants base their argument on the legislative history of section 2416 and the case law interpreting the statute.

The Senate Report accompanying the passage of section 2416 states that "[a]s a general proposition, the responsible official would be the official who is also responsible for the activity out of which the action arose." S.Rep. No. 1328 (1966), *reprinted in* 1966 U .S.C.C.A.N. 2502, 2507. Citing the legislative history, several courts have held that knowledge of material facts by officials in agencies other than the Department of Justice will trigger limitations under section 2416. *See, e.g., United States v. Kass,* 740 F.2d 1493, 1498 (11th Cir.1984) (officials of private health insurance provider under contract with government considered "responsible officials"); *United States ex rel. Kreindler & Krenidler v. United Technologies Corp.,* 777 F.Supp. 195, 205 (N.D .N.Y.1991) *aff'd on other grounds,* 985 F.2d 1148 (2d Cir.1993) (knowledge by Army officials in charge of procurement project triggered limitations period); *Incorporated Village of Island Park,* 791 F.Supp. at 372 ("responsible officials" were HUD supervisors rather than representatives of the Department of Justice); *United States v. Ruegsegger,* 702 F.Supp. 438, 442 (S.D.N.Y.1988); *United States v. Reinhardt College,* 597 F.Supp. 522, 524 (N.D.Ga.1983). These cases support the view that the "responsible officials" are the government officials or agents with controlling authority over the activity from which the cause of action arose.[FN1]

FN1. In holding that a "responsible officer" under section 2416(c) may include persons outside the Department of Justice, this court does not reach the question of whether the same applies to the statute of limitations for a False Claims Act claim, 31 U.S.C. § 3731(b).

The government argues that only officials within the Department of Justice can be "responsible officials" because only the Department of Justice has authority to initiate, or jurisdiction over, litigation for fraud. (Docket Entry No. 170, p. 10). Under the statute, the applicable standard is when the " responsible official" knew or reasonably could have known of facts material to the cause of action. The statute does not require that the "responsible official " must be able to initiate litigation in response to the material facts. The Department of Justice only gains jurisdiction over a fraud claim when the Administrative Contracting Officer has evidence for believing fraud is present and refers the matter to the Department of Justice. *See* 41 U.S.C. § 605; Federal Acquisition Regulations 33.209, 48 C.F.R. 33.209 ("If the contractor is unable to support any part of the claim and there is *evidence* that the inability is attributable to misrepresentation of fact or to fraud on the part of the contractor, the contracting officer shall refer the matter to the [Department of Justice].") (emphasis added). The government's argument would delay the statute of limitations long past the time when a contracting officer with controlling authority over the contract had enough evidence that fraudulent activity had occurred to refer the case to the Department of Justice.

*4 The government unsuccessfully asserted a very similar argument in the case of *United States v. Kensington Hospital,* 1993 WL 21446 (E.D.Pa.). In *Kensington,* the government filed suit against a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hospital and a number of doctors for various types of medicare/medicaid fraud, including common law fraud. *See id.* at *1. The government argued that under section 2416(c), the statute of limitations was tolled until a "responsible official" of the Department of Justice knew or could have known of the material facts. The defendants argued that a Federal Bureau of Investigation agent, whose duties included " 'investigate fraud, waste and abuse" ' in the medicare/medicaid system, was the "responsible official" charged with the duty to act. The agent became aware of the potential fraud when he attended meetings with hospital representatives to discuss problems in their billing. *Id.* at *12. The court held that although the method of the fraud was not yet known, the FBI agent had "clear and explicit notice of the facts," evidenced by the government's own admissions. The government could not delay until the case had been further investigated by the Department of Justice. *See id.* at *10-12.

Similarly, in *United States v. Boeing Co., Inc.*, the Fourth Circuit held that contracting officials with less responsibility than the contracting officer in the present case were "responsible officials" whose knowledge of facts material to the claim ended the tolling period. 845 F.2d 476, *rev'd on other grounds sub nom. Crandon v. United States,* 494 U.S. 152 (1990). In *Boeing,* the government sued a defense contractor and former employees for improper severance payments paid to the employees. The government argued that only the Department of Defense contracting officer for Boeing, who learned the facts after the problem was referred to him by his subordinates, could be the " responsible official." *See id* . at 482. The court noted that "[t]he government fails to explain, however, why [Defense Contract Audit Agency] employees charged with auditing responsibilities were not charged with the responsibility to act here." *Id.* The court held that the DCAA employees and managers who recognized the problem were " responsible officials," barring the claim as untimely. *See id.*

This court joins the majority view in holding that a " responsible official" under section 2416 is not limited to officials in the Department of Justice who have the authority to initiate litigation. In this case, the Army Corps of Engineers' Administrative Contracting Officer for the drilling contract at issue, Dan L. Johnson, described his duties with respect to that contract:

... limited contracting authority (not to exceed $100,000) for any one modification under specific contract clauses, verify contractor performs the technical requirements of the contract in accordance with the contract terms, ensure inspections are performed to verify compliance with the contract, and perform acceptance for the Government of services performed under this contract. Specifically for this contract I was required to serve as the primary point of contract (sic) on all matters relating to financial, technical, and performance.

***5** (Docket Entry No. 171, Ex. A, Affidavit of Dan L. Johnson, ¶ 4).

Analogous to the agent in *Kensington* and the DCAA employees in *Boeing,* Dan Johnson was the government official charged with ensuring performance of, and compliance with, the contract terms; with accepting the work on behalf of the government; and with serving as the "primary point of contact" for the contract matters that are the basis of the fraud claim. Johnson was the government official "charged with the responsibility to act in the circumstances" under section 2416. This court must evaluate the record evidence as to what Johnson knew or reasonably could have known regarding the material facts at issue, and when that occurred.

B. "Facts Material to the Right of Action"

The "facts material to the right of action" alleged in this case are those facts which give rise to the government's fraud claim. *United States v. Stella Perez,* 956 F.Supp. 1046, 1058 (D.P.R.1997). Under Texas law, "[a] fraud cause of action requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." ' *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47-48 (Tex.1998) (citing *Sears, Roebuck & Co. v. Meadows,* 877

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.W.2d 281, 282 (Tex.1994); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990) ). To show fraud under Oklahoma law, a plaintiff " must prove a) [the defendant] made a material representation; b) that the representation was false; c) [the defendant] knew it was false or made it recklessly, without regard for its truth; d) [the defendant] made it with the intention that [the plaintiff] act upon it; and e) injury was suffered by [the plaintiff] as a result." *McCain v. Combined Communications Corp.,* 975 P.2d 865, 867 (Okla.1998) (citing 76 O.S.1991 § 3)). As this court noted in an earlier opinion, the elements of fraud in the two jurisdictions are not significantly different. Neither party offers a conflict-of-laws analysis or suggests that one is necessary.

Both falsity and intent are material elements of a fraud claim. *See Formosa Plastics Corp.,* 960 S.W.2d at 47; *Meadows,* 877 S .W.2d at 282; *McCain,* 975 P.2d at 867. Facts showing these elements are, in the language of section 2416(c), the "facts material to the right of action." *See also Stella Perez,* 956 F.Supp. at 1052 ("material" facts under section 2416(c) are the facts that are " essential to a cause of action"). The parties appear to agree that the relevant material facts are the facts that support an inference that material false statements were made with an intent to deceive. ( *Compare* defendants' brief, Docket Entry No. 164, p. 12, *with* government's brief, Docket Entry No. 170, p. 12).

The government sets out the criteria for facts that are sufficient to support an inference of an intent to commit fraud: facts that either show the defendants' motive in making false statements or that identify circumstances showing "conscious behavior" on the part of the defendants in making such statements. (Docket Entry No. 170, Government's Response, p. 12). Defendants do not contest this definition. Combining the section 2416(c) standard with this definition, limitations did not begin to run, or was tolled, until Dan Johnson, the responsible government official, knew, or reasonably could have known, that: defendants made material false statements or omissions in the REA; the statements or omissions were either known to be false when made or were made with reckless disregard for their truth or falsity; and defendants intended the government to act upon the false statements or omissions. *See Formosa Plastics Corp.,* 960 S.W.2d at 47-48.

*6 Defendants argue that the summary judgment evidence provided by the government itself shows that Dan Johnson had sufficient information reasonably available long before the relator filed his complaint, sufficient to support an inference that the REA contained material misrepresentations made with an intent to defraud. The government argues that the record reveals that until the relator filed his complaint, the responsible government official could not reasonably have known that defendants' false statements in the REA were made with the necessary intent.

III. Analysis: What Responsible Officials Knew and When

The Corps received the certified REA from NACC on May 16, 1994, containing the pass-through of ECE's claim. (Docket Entry No. 170, Ex. A, Johnson Aff., ¶ 11). The government claims that all three defendants falsely certified that the information in the REA was accurate and submitted in good faith. In the REA, defendants sought a $3.9 million adjustment for cost overruns and delays resulting from site conditions that differed from those expected when ECE made its bid. Defendants based their request for equitable adjustment on the claim that the government had superior knowledge of the subsurface site conditions that it withheld from defendants.

On the basis of the certifications submitted with the REA, the government conducted the investigation, the cost of which it seeks to recover as damages for the fraud claim it asserts in this lawsuit. The government alleges that in the REA, defendants falsely represented and certified that the government had superior knowledge about differing site conditions under and around Building 3001, that it withheld from defendants. The government asserts that defendants made these false representations and certifications, with knowledge of their falsity, and with the intent that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

government act upon the representations and certifications.

The government's allegations include that defendants made the following specific, intentionally false representations in the REA:
• In the REA, defendants stated or certified that when ECE began drilling, it encountered subsurface conditions which were materially different from the conditions portrayed in the soil boring logs and representations of CH & A and the government upon which ECE based its bid. Before bidding, ECE received representations and soil boring logs and had subsequent discussions with government and other on-site personnel regarding the nature of subsurface conditions, which led ECE to conclude that drilling conditions would primarily be loose, unconsolidated material. Instead, ECE encountered hard cemented formations.
In this suit, the government asserts that it had provided accurate soil boring logs in the contract information that NACC had received and, in turn, had provided to CH & A, well before ECE prepared a bid.
• In the REA, defendants referred to the vertical well logs that CH & A provided ECE before bidding as "government logs."
*7 In this suit, the government asserts that CH & A did not provide ECE with the logs that the government had given to NACC as part of the contract bid package. Instead, the only logs CH & A provided ECE before ECE submitted its bid were logs prepared by CH & A.
• In the REA, defendants asserted or certified that the government withheld information that horizontal wells had previously been drilled in nearly the same location as the wells ECE was to drill. Defendants asserted or certified that the government not only failed to include the information about the horizontal wells in the bid specifications, but did not reveal the information until after ECE had begun to drill.
In this suit, the government asserts that it informed defendants of the experimental horizontal wells and made the logs available before ECE began any drilling work.
• In the REA, defendants asserted or certified that the logs for the experimental horizontal wells contained vital, material information.

In this suit, the government asserts that the experimental horizontal well logs are gamma logs, measuring radioactivity levels, and provide no significant information as to the extent of cementation in subsurface formations.

The government alleges that defendants also intentionally omitted material information necessary to make the statements in the REA not misleading, including the following:
• In the REA, defendants omitted information showing that the Corps contract logs that the government did include in the NACC bid package, but that CH & A and NACC did not give to ECE, accurately represented the subsurface conditions.
• In the REA, defendants omitted the fact that the soil boring logs on which ECE based its bid were not prepared or provided by the government.

In its original complaint-in-intervention, the government includes allegations of facts to show that defendants made the misrepresentations and omissions in the REA with knowledge of their falsity. It is clear that the government could not have made some of these allegations until after the relator filed suit in December 1995. These include the allegation that defendants met with the relator and specifically agreed to rewrite a draft of the REA to shift responsibility for the cost overruns and delays away from ECE's or CH & A's contract performance deficiencies and to the government for withholding superior knowledge of subsurface conditions. Some of the allegations in the complaint-in-intervention are based on information obtained from defendants' documents, such as a CH & A February 1993 project summary and a CH & A July 20, 1993 letter to ECE, that the government contends it did not obtain until after the relator filed his lawsuit.

Defendants argue that even setting aside the information that the relator provided by filing suit, or that the government did not obtain until after the relator had filed suit, the responsible government official still had sufficient information in the REA itself reasonably to know that the REA contained material misrepresentations. The government argues

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that until the relator came forward with his accusations in December 1995, responsible officials had no reasonable basis to know that defendants made false statements in the REA with an intent to deceive.

A. The REA Representations as to the Horizontal Well Logs

***8** The REA contained the following statements about the horizontal well logs:

... ECE found out after the work was started that in late 1991 the Air Force, under another contract, had horizontal wells drilled under Building 3001 in nearly the same location as the wells ECE was drilling for CH & A. Therefore, the Government had knowledge of the subsurface conditions unique to the installation of horizontal wells that would have been material to ECE's bid for this project. This information would also have been invaluable during the actual drilling effort. We are perplexed as to why the Government did not disclose this vital information during pre-bid discussion and in the bid package. We are even more perplexed as to why this vital information was withheld after we started having problems boring through the hard cemented formation with drill bits and undersized equipment that were made for drilling the materials that ECE had expected to encounter.

....

The verbal representations and the written information provided to ECE failed to include information the Government had in its possession regarding an earlier series of horizontal wells that had been installed at nearly an identical location to the wells called for by this project. ECE asserts that data relating to those wells should have been a part of the specifications for this project. Had such information been made available, the opportunity would have existed for ECE to examine the evidence of subsurface conditions actually encountered in a horizontal application in the preparation of their bid. This withholding of Superior Knowledge by the Government constitutes a serious defect in the bid specifications for this project.

....

The COE neglected to advise North American Construction, CH & A, or ECE of the fact that horizontal wells had been drilled at an earlier date at the same sites as this project. The COE also failed to provide any information regarding these earlier wells. This left ECE in the position of having to bid and construct this project without the benefit of Superior Knowledge, unique to horizontal drilling operations, particularly the previous horizontal drilling information from the earlier wells drilled under the building. This information was in the possession of the government.

(Docket Entry No. 170, REA, pp. 8, 10, 31).

The record contains competent summary judgment evidence as to what Dan Johnson knew, or reasonably could have known, in May 1994, about the 1991 experimental horizontal well logs. In interrogatories, defendants asked the government whether, when ECE submitted its bid in late 1992, the Corps had advised NACC, CH & A, or ECE of the existence of horizontal wells that had been drilled at an earlier date near or at the same site. The government stated, in response, that it had specifically advised NACC and CH & A of these earlier horizontal wells in May 1992, before ECE submitted its bid, and again after ECE submitted its bid but before drilling began. "NACC and CH & A were present during meetings in May 1992 and thereafter when these horizontal wells were discussed." (Docket Entry No. 164, Ex. D, Response 215). The government specifically stated that in 1992, it disclosed the existence of the horizontal well logs and made them available to defendants, including ECE. "The Government made all logs of wells under Building 3001 available to NACC, CH & A, and ECE before ECE commenced drilling on the horizontal wells." (Docket Entry No. 164, Ex. D, Response 71).

***9** The record shows that the Corps knew when it received the REA in May 1994 that NACC and CH & A had been told about the horizontal wells, before ECE submitted its bid. The record shows that responsible Corps officials knew when the REA was received in May 1994 that NACC, CH & A, and ECE representatives had been told about, and been given access to, the horizontal well logs, before ECE began drilling. (Docket Entry No. 164,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex. D, Response to Request No. 71). The record shows that the Corps knew in May 1994 that ECE, CH & A, and NACC all knew that ECE had been given access to the horizontal well logs. (*Id.;* Response to Request No. 215). When the government received the REA, the responsible government official knew, or reasonably could have known, that the accusation that the Corps had failed to disclose or provide the horizontal well logs before ECE began to bid or drill was false.

The government's own criteria for whether there are facts sufficient to support an inference of intent is whether there are facts that show the motive of defendants or circumstances indicating "conscious behavior" on the part of defendants. When defendants submitted the REA, the responsible government official knew, or reasonably could have known, that defendants made the accusation that the Corps intentionally failed to disclose and provide the horizontal well logs, knowing it to be false. The government's own summary judgment evidence shows that NACC and CH & A representatives were present in meetings with Corps personnel occurring before ECE submitted its bid in August 1992. The record shows that representatives from all three defendants were also present in meetings with Corps personnel after ECE received the subcontract but before drilling began. In those meetings, Corps personnel discussed the horizontal well logs and specifically made them available to the defendants. When the Corps received the REA in May 1994, the responsible government official knew, or reasonably could have known, that defendants' denial of receiving this information was made with knowledge that the denial was false. The circumstances show "conscious behavior" on the part of defendants in stating that the government withheld the horizontal well logs. (Docket Entry No. 170, Government's Brief in Opposition to Motion for Partial Summary Judgment, p. 12).

The government's own summary judgment evidence also shows that shortly after ECE began drilling, responsible government officials knew that defendants were trying to pass responsibility for their delays and costs to the government. Starting shortly after drilling began, Corps personnel knew that defendants were claiming that the government had known of the subsurface conditions but had not provided that information to defendants. (Letter from Dan Johnson, Nov. 12, 1992, Docket Entry No. 164, Ex. F; letter from R.L. Hedrick, October 9, 1993, Ex. H). When the REA was submitted, the responsible government official knew that the defendants had a motive to accuse the government of failing to disclose or provide the horizontal well logs, a motive of shifting responsibility for the cost overruns and delays away from defendants' deficient contract performance to inadequate or incorrect information.

***10** Using the government's own definition for facts sufficient to support an inference of intentional fraud, the responsible government official knew, or reasonably could have known, when the REA was submitted in May 1994, that: (1) defendants' statements that the government had failed to disclose or provide access to the horizontal well logs was false; (2) defendants knew it was false; and (3) defendants made the statements consciously and with a specific motive to deflect the blame for cost overruns and delays from defendants to the government. In May 1994, responsible government officials knew, or reasonably could have known, the facts material to this allegation of intentional fraud.

The government later discovered additional facts relevant to the intentional deception it alleges. Some time after the relator made his accusations, the government obtained a CH & A Project Summary dated February 24, 1993, stating that after ECE submitted its bid, but before it began drilling, the government gave ECE the opportunity to inspect two well logs, including the logs for previous horizontal wells. Sometime after the relator filed his suit, the government also obtained an October 21, 1992 ECE entry in a project chronology, stating that ECE had asked the Corps for logs of horizontal wells at the site. Those additional facts strengthen and add specificity to the government's knowledge of the fraudulent statement in the REA as to the horizontal logs. However, the law does not require that the government have information that is so complete or so inculpatory before the responsible official can be charged with knowledge of the facts material to a fraud cause of action, so as to trigger limitations. *See, e.g., United*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*States v. Kass,* 740 F.2d 1493 (11th Cir.1984) (not necessary that relevant government officials have all details of a claim before limitations period begins to run, only that the facts making up the very essence of the right of action are reasonably knowable).

B. The REA Representations as to the Vertical Logs

The REA contained the following statements as to the vertical logs:

The conclusions reached by ECE from representations and soil boring logs provided to ECE and from subsequent discussions with Government and other on-site personnel regarding the nature of subsurface conditions were that drilling conditions would primarily be loose, unconsolidated material. ECE relied on these conclusions in preparing its bid and in agreeing to the terms of the contract. The material difference between these representations and the actual conditions caused the project to run longer and cost far more than had been anticipated.

....

In an early telephone conversation concerning this project that took place between Mr. Ray Abercrombie, representing ECE, and Mr. Bayani Abueg representing CH & A, on August 27, 1992, Mr. Abercrombie requested a set of boring logs to identify the subsurface conditions at the site. Mr. Abueg forwarded a set of vertical boring logs that were received by ECE on September 1, 1992. These logs shows subsurface conditions consistent with the "heterogenous ........ fractured rock, clay, and sand units described in Mr. Wyatt's June 3, 1992 letter. These described conditions were indicative of "easy" drilling. however, these were not the conditions encountered in the horizontal drilling under Building 3001.

***11** ....

ECE arrived on site on October 26, 1992. Rig-up commenced on October 28, 1992 and ECE began drilling on October 29, 1992. ECE signed the contract with CH & A on October 30, 1992. Within a day or two, ECE drillers knew that a serious difference existed between the conditions of the subsoil as the soil boring logs used for bidding had represented them and conditions actually encountered. If the actual site conditions had proved to be the sand and silt layers with some soft sandstone as represented verbally and confirmed by the soil boring logs provided for bidding, ECE would have been able to drill the planned wells using drag bits with normal penetration rates of between 20 and 30 feet per hour. Instead, the subsoil proved to consist primarily of heavily cemented sandstone and shales that ultimately required the use of heavy duty high torque slow rotation mud motors and specialized rock bits.

....

The difficult drilling conditions ECE was actually encountering under the building were at odds with *all of the vertical drilling logs.* (Emphasis added). For this reason, ECE determined that it had to bring in additional tools and equipment to deal with the unexpected tougher subsurface conditions.

(Docket Entry No. 170, Final REA, pp. 10, 28).

In this suit, the government contends that ECE encountered unexpected subsurface conditions, not because the Corps vertical well logs provided in the contract bid documents were incorrect, but because CH & A and NACC did not provide the Corps vertical well logs to ECE. In a letter from ECE's president, Alton Watson, to David Rendini of CH & A, ECE accused CH & A of providing ECE with vertical well logs that showed soft soil conditions. The government asserts that the logs CH & A gave ECE were not the logs that the Corps had originally provided. The government also asserts that CH & A knew that the Corps logs accurately described the site conditions. The government points to a project summary by Rendini of CH & A, dated February 24, 1993, in which Rendini acknowledges that CH & A had not given ECE the Corps vertical logs, which described dense soil conditions that were actually present.

The summary judgment record contains no evidence that in May 1994, the Corps knew that CH & A had supplied ECE with different vertical well logs than the Corps had previously given to NACC. However, in May 1994, the Corps did know what vertical well logs it had provided to NACC and CH & A. Corps personnel knew that the vertical well logs it had provided to NACC and CH & A before ECE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

submitted its bid showed cementation and dense soil formations. The REA stated that the vertical well logs ECE received before bidding showed " sand and silt layers with some soft sandstone." Corps personnel knew in May 1994 that the logs the Corps had provided to NACC and CH & A before ECE bid did not show these conditions. When the REA was submitted in May 1994, the responsible government official knew, or reasonably could have known, that the statement that all the vertical well logs showed soft sandstone was false. The responsible government official also knew, or reasonably could have known, that at least NACC and CH & A knew that this statement was false. The responsible government official also knew, or reasonably could have known, that the defendants were attempting to pass responsibility for their delays and cost overruns to the government. In May 1994, the responsible government official knew, or reasonably could have known, that the REA statement describing the contents of all the vertical logs was false, made with knowledge or reckless disregard of its falsity, made consciously, and made with the motivation to shift blame to the government for delays and overruns.

***12** The government later learned of additional facts that support its allegations of fraud with respect to the representations concerning the vertical logs. In its Second Amended Complaint, the government alleges that ECE commissioned a geological report from American Environmental Consultants ("AMENCO") comparing the vertical logs it received from CH & A with the vertical logs the Corps had supplied to NACC and CH & A but which CH & A withheld from ECE. The government asserts that this report, which concludes that the logs CH & A withheld from ECE were accurate while the logs given to ECE were not, was intentionally deleted from the final draft of the REA submitted to the Corps. The government alleges that the defendants engaged in a conspiracy to alter the earlier drafts of the REA, so as to make it appear that the vertical well logs provided by the Corps, and not CH & A's failure to deliver them, were to blame for the delays and cost overruns. Knowledge of such specific and inculpatory facts, however, is not necessary to trigger the limitations period. *See, e.g., Kass,* 740 F.2d at 1493.

The government argues that it is unclear what Johnson knew and when he knew it. However, the government fails to define a missing piece in the st atutory timing puzzle and applies what appears to be an overly exacting standard. The standard is not whether Johnson had actual knowledge of facts material to a fraud cause of action, but rather whether and when he knew or reasonably could have known of material facts.

The government admits in its pleadings and discovery responses that Corps personnel involved in administering the contract knew the REA contained false statements when the REA was filed. The record shows that Corps personnel involved in the contract meetings and discussions knew that defendants knew that the REA statements were false. The government admits in its answers to interrogatories that before the REA was filed, Corps personnel, including Dan Johnson, were aware of continuing efforts by defendants to shift the blame for cost overruns and delays to the government. The evidence discloses that the government knew of false statements, knew that those making the statements did so with knowledge of their falsity, and knew of the motivation for making the false statements. The missing link in the chain of facts material to the fraud claim is not identified or apparent.

The evidence of Johnson's duties and the extent of his involvement in the project show that he knew, or reasonably could have known, on receipt of the REA, that defendants had made false statements and omissions in the REA about the Corps' own actions; that the defendants making and certifying the truth of the statements knew that the statements and omissions were false when made; and the motive defendants had to make the misrepresentations in the REA. The responsible government official knew, or reasonably could have known, that defendants' certifications of the accuracy and good-faith submission of the REA were intentionally false. The statute of limitations on the common law fraud claim began to run when the Corps received the REA in May 1994.[FN2]

FN2. Because this court finds that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statute of limitations began to run upon the Corps' receipt of the REA, this court does not reach the issue of whether the audit completed in June 1995 also would have triggered the limitations period.

IV. The Relation Back Issue

***13** The government argues that even if the common law fraud claim would otherwise be barred by the statute of limitations, the claim could relate back to December 11, 1995, the date when the relator filed his initial complaint. Several courts have held that a complaint-in-intervention filed under Rule 24 may relate back to the date of an earlier complaint, provided there is no prejudice to the defendant. *See, e.g., Cummings v. U.S.,* 704 F.2d 437, 439-40 (9th Cir.1983); *Ross v. Patrusky, Mintz & Semel,* 1997 WL 214957, *8 (S.D.N.Y.1997). At least one court has disagreed, holding that a complaint-in-intervention filed under Rule 24 may not relate back to the date of an earlier claim, so as to defeat an otherwise valid statute of limitations defense. *Ceribelli v. Elghanayan,* 1994 WL 529853, *2 (S.D.N.Y.) (arguing that "the explicit provisions for relation-back of amendments under Rule 15(c) and of substitutions of real parties in interest under Rule 17(a) demonstrate that Congress knew how to create such a mechanism when it so chose"). The Fifth Circuit has not directly addressed whether the relation back doctrine applies to a complaint-in-intervention under Rule 24, although it has held that a pleading that merely changes a plaintiff may relate back to an earlier pleading under Rule 15(c). *See SMS Financial, Ltd. Liability Col v. ABCO Homes, Inc.,* 167 F.3d 235, 244 (5th Cir.1999).

An amended pleading may not relate back to a prior pleading unless the defendant had adequate notice of the amended pleading's claims within the applicable limitations period. *See Travelers Insurance Company v. Brown,* 338 F.2d 229 (5th Cir.1964) (holding that relation back applies when " the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint"); *Williams v. U.S.,* 405 F.2d 234 (5th Cir.1968) (stating that notice to the opposing party is the critical element involved in relation back determinations); *Williams v. U.S. Postal Serv.,* 873 F.2d 1069, 1073 (7th Cir.1989) ("[a] party must receive actual notice within the limitations period before Rule 15(c) will apply").

The relator's complaint was filed under seal in December 1995. The seal was not lifted until the government filed its complaint-in-intervention in December 1998. Defendants had no prior notice of the government's (or of the relator's) claims for over six years after ECE began to drill and over four and one-half years after defendants submitted the REA. The prerequisite to the relation back doctrine, notice to the defendant, was not satisfied in this case.

The government might argue that the lawsuit commenced, for the purpose of limitations, when the relator filed his initial complaint, not when the complaint was unsealed or when the government filed its complaint-in-intervention. In FCA cases, the relator is required to file the initial complaint under seal, under 31 U.S.C. § 3730(b)(2). At least one court has held that the filing of an initial complaint under seal in an FCA action cuts off the running of the statute of limitations on the FCA claim. *See United States ex rel. Downy v. Corning,* 118 F.Supp.2d 1160 (D.N.M.2000). *Downy,* however, involved an FCA claim, and an interpretation of the specific statute of limitations for FCA claims, 31 U.S.C. § 3731(b), not a common law fraud claim and the statute of limitations applicable here. If separate statutes of limitations are to be applied to the separate claims in the government's complaint-as they properly are in this case-they should be interpreted according to the rules that apply to each statute. *See, e.g., U.S. v. Kensington Hosp.,* 1992 WL 186989, *6 n. 4 (E.D.Pa.) (holding that statute of limitations for FCA claims was different from applicable statute of limitations for common law fraud claims); *Adams v. R.R. Donnelley & Sons,* 2001 WL 662206, *6 (N.D.Ill.) (acknowledging that different statutes of limitations often apply to different claims made within a single lawsuit).

***14** The fundamental purpose of statutes of limitations is to protect defendants from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prosecution of stale claims and to guarantee that parties are notified when they are being sued. Statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *U.S. v. Kubrick,* 444 U.S. 111, 117 (1979). A complaint filed under seal does not provide notice to a defendant. It does not ordinarily toll the running of a statute of limitations. The government should not avoid the statute of limitations for common law fraud claims by combining these claims with *qui tam* claims for which different limitations provisions may apply.

V. Conclusion

This court GRANTS defendants' motion for partial summary judgment on the government's common law fraud claim.

S.D.Tex.,2001.
U.S. ex rel. Wilkins v. North American Const. Corp.
Not Reported in F.Supp.2d, 2001 WL 34109383 (S.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.